UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MINDY FEWLESS,

       Plaintiff,                                 Case No. 1:09-cv-995

v.                                                   HON. JANET T. NEFF

TRINITY HEALTH–MICHIGAN d/b/a
MERCY HOSPITAL, CADILLAC,

       Defendant.
_____/

## OPINION

Plaintiff Mindy Fewless, a former employee of Defendant Trinity Health–Michigan d/b/a Mercy Hospital, Cadillac, filed this action, alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.,* as well as Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2102 *et seq*. Pending before the Court is Defendant's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 (Dkt 90). Plaintiff filed a response (Dkt 95), and Defendant filed a reply (Dkt 101). Having fully considered the written briefs and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the following reasons, the Court concludes that Defendant's motion is properly granted.

**I. BACKGROUND**

In late 2007, Defendant opened an orthopedic clinic (SMF[1] ¶ 1). The orthopedic clinic is located in a free-standing building several miles away from the main hospital (*id.* ¶ 2). Plaintiff was hired as the Office Manager for the orthopedic clinic in December 2007 (*id.* ¶ 4). Initially, Plaintiff reported to John MacLeod, Defendant's CEO (*id.* ¶¶ 5, 8).

In early 2008, the orthopedic clinic moved to a new building and added an occupational medicine practice (SMF ¶ 10). Plaintiff assumed responsibility for starting and managing the occupational medicine clinic (*id.* ¶ 11). Plaintiff was responsible for managing all administrative functions of both clinics, including participating in, developing and monitoring the budgets for the practices; training non-clinical staff; ensuring positive working relationships with the physicians; capturing revenue; handling the billing process; attending to Joint Commission for Accreditation of Healthcare Organizations (JCAHO) and Occupational Safety and Health Act (OSHA) issues; and marketing and expanding the clinics (*id.* ¶¶ 12-13). Plaintiff was also responsible for "establish[ing] and maintain[ing] an operating environment, which assures effective, efficient, safe operation of the office practice that respond to patient, physician and staff needs" on behalf of both clinics (*id.* ¶ 14).

Defendant decided to add an obstetrics/gynecology (OB/GYN) practice to the clinic (SMF ¶ 15). Before its opening, management oversight for the clinic was transitioned from MacLeod to Chief Human Resources Officer Peter Lanc, who became Administrator for Physician Offices (*id.* ¶¶ 21, 22). Lanc, like McLeod, had his office at the hospital, several miles away from the clinic building (*id.* ¶ 23). On June 30, 2008, MacLeod and Lanc offered Plaintiff the Office Manager position for the OB/GYN practice (*id.* ¶ 16). She was responsible for starting the OB/GYN practice

---

[1]Defendant's Statement of Material Facts (Dkt 96), Plaintiff's Response to Defendant's Statement of Material Facts (Dkt 100).

and managing its administrative functions (*id.* ¶ 17). A few months before the OB/GYN practice officially opened in January 2009, the orthopedic clinic closed (*id.* ¶¶ 18, 20). Plaintiff retained responsibility for managing the occupational medicine practice (*id.* ¶ 19).

In September 2008, Plaintiff told MacLeod and Lanc that she was pregnant (SMF ¶ 25). On March 20, 2009, Plaintiff, Lanc, Lori Barnes (Manager – Obstetrical Services), Cristen Brandsma (Director of Nursing), and Diana Seehase (Employee Health Manager) met to discuss maternity leave coverage issues (*id.* ¶ 26). At the March 20, 2009 meeting, it was determined that Seehase would temporarily assume Plaintiff's responsibilities for the occupational medicine practice, and Barnes and Brandsma would temporarily share responsibilities for the OB/GYN practice (*id.* ¶ 28).

However, after the March 20, 2009 meeting, Lanc and Brandsma had additional discussions regarding coverage of the OB/GYN practice (SMF ¶ 29), and it was determined that an interim Office Manager should be hired to manage the OB/GYN practice while Plaintiff was on maternity leave (*id.* ¶ 31). On April 17, 2009, Lanc and Brandsma told Plaintiff that they wanted to hire an interim Office Manager to cover the OB/GYN practice while she was on leave (*id.* ¶ 32).

On April 24, 2009, at Brandsma's request, Mary Margaret ("Mike") Winkelmann was interviewed for the interim Office Manager position (SMF ¶ 38). Present at the interview were Plaintiff, Lanc, Brandsma and Barnes (*id.* ¶ 39). During the interview, the group explained to Winkelmann that they were seeking someone to manage the OB/GYN practice for only a ten-week period, and that Plaintiff would return to the Office Manager position following her leave (*id.* ¶ 40). Winkelmann was asked during the interview if she had heard anything about the OB/GYN clinic, to which Winkelmann responded, "Do you want me to tell the truth or do you want me to get the

3

job?" (*id.* ¶ 42). Plaintiff acknowledged that there were lengthy patient wait times at the clinic and that the practice was "working though some problems" (*id.* ¶ 37).

Winkelmann was hired as the interim Office Manager of the OB/GYN clinic beginning on April 30, 2009 (SMF ¶ 47), although Plaintiff was opposed to Lanc and Brandsma's selection (*id.* ¶ 33). According to Winkelmann's offer letter, she was hired "for a period of 10 weeks" (*id.* ¶ 48). Winkelmann and Plaintiff worked together on April 30, 2009 (*id.* ¶ 49). On May 1, 2009, Plaintiff delivered her baby and immediately commenced her FMLA leave (*id.* ¶ 50). Plaintiff's request for leave was approved without any issues (*id.* ¶ 51).

Winkelmann testified that shortly after she was hired, she discovered numerous problems with the OB/GYN practice (SMF ¶ 53). According to Defendant, Winkelmann discovered that patients were waiting up to 90 minutes to see a doctor (*id.* ¶ 54); that patients did not know which doctor they would be seeing (*id.* ¶ 55); that patient charts did not include a "problem list/medication list" (*id.* ¶ 58); that nurses were not using "SOAP" notes, the industry standard for taking uniform notes (*id.* ¶ 59); that observation patients (patients whom doctors observed in the hospital) were not being correctly billed (*id.* ¶ 60); that Plaintiff had not been using the most recent "charge master," which had resulted in the clinic billing less than the allowable charges for services (*id.* ¶ 61); that both doctors were being paid more than the amount specified in their contracts (*id.* ¶ 62); that there was no drug sample log to track the distribution of sample drugs (*id.* ¶ 66); that the Health Insurance Portability and Accountability Act (HIPAA) posting and other legally required notices were not posted in the clinic (*id.* ¶ 67); that there was no system for tracking after-hours calls to doctors (*id.* ¶ 68); and that items were overstocked, and overstocked items were unable to be returned for a refund (*id.* ¶ 69). Defendant claims that Winkelmann opened new patient rooms, which Plaintiff had

not utilized, placed the physicians on a regular schedule, and streamlined the in-take process (*id.* ¶ 57). Plaintiff responds that Lanc had denied her money to equip additional patient rooms and denied her request for more staff (*id.*).

Regarding the conditions at the occupational medicine clinic, Seehase similarly testified that she believed that clinic was a "mess" (SMF ¶ 76). According to Defendant, Seehase discovered that there were no "accountabilities for staff;" that numerous supplies and medications were overstocked and/or outdated; that no policies were being maintained on behalf of the practice; that required postings were missing; that employees were not being "charged" to the proper practice; that purchases and requisitions were combined for all of the practices, instead of being segregated by practice; that the clinic had no inventory list of supplies; that there was no filing system; that the phones were not working properly; and that Plaintiff failed to maintain a current list of client companies and/or contracts with these companies (*id.* ¶¶ 77-86). Lanc informed MacLeod about the problems with both clinics that Winkelmann and Seehase reported to him (*id.* ¶ 90).

On May 21, 2009, Brandsma, Seehase and Barnes met with Lanc (*id.* ¶ 91). They reported to Lanc that Plaintiff stated the OB/GYN clinic was being "run into the ground" and that the occupational medicine clinic was not "salvageable" and "was going belly up," statements that Plaintiff denied making (*id.* ¶¶ 92-93). Lanc indicated in his May 21, 2009 meeting notes that Brandsma, Seehase and Barnes characterized Plaintiff as "not being receptive" to the changes that Winkelmann and Seehase had made in clinic operations and that she "wanted to see people fail" (*id.* ¶ 94).

On May 29, 2009, Plaintiff visited the occupational medicine clinic (SMF ¶ 97). During her visit, Plaintiff allegedly told employees that she "hated" Dr. Bizzigotti, a staff physician at the

5

hospital, and she also allegedly spoke negatively and profanely about Diane Hamilton, an OB nurse at the hospital (*id.* ¶¶ 98-99). Defendant contends that Seehase witnessed Plaintiff making the statements, but Plaintiff denies making the statements (*id.* ¶¶ 98-100). Plaintiff does not dispute that Seehase reported the comments to Lanc and Mary Neff, Defendant's COO and Chief Nursing Officer (*id.* ¶ 100). Seehase told Lanc and Neff that these comments were inappropriate, especially for someone in a management position (*id.* ¶ 101). Seehase opined that if Plaintiff was making these comments inside the clinic, it was safe to assume that she was making similar negative comments about staff and physicians to people outside the clinic (*id.* ¶ 102).

On June 8, 2009, Seehase wrote a memo to Lanc outlining the concerns she had about Plaintiff (SMF ¶ 104). Seehase began the memo by stating that, since taking the interim Office Manager position, she, along with the associates in the two practices, had been subject to Plainitff's "unacceptable behavior" (*id.* ¶ 105). Seehase stated in her memo that Plaintiff had used "inappropriate language" when visiting the office during her leave (*id.* ¶ 106). Seehase also stated in her memo that Plaintiff had "questioned the staff regarding changes in the office and when the staff explained the changes, she stated 'whatever' and her body language indicated how annoyed she was with the staff answers" (*id.* ¶ 107).

Seehase further stated in her memo that she has "concerns with the negativity Mindy displays in a management position" (SMF ¶ 108). Seehase related in her memo how one of the staff members thanked her for including her in the decision-making process, as including staff was not something that had happened while Plaintiff was managing the clinic (*id.* ¶ 109). Seehase concluded her memo by stating: "I would like to reiterate my concerns with Mindy's negativity not only to the staff, but also to the physician[s]. When the staff and physician[s] feel this negativity it can't help

but be reflected toward our customers. If we would like to see growth in the practice, all involved with the practice from Manager, Staff and Physician, need to feel as if they are all part of the team" (*id.* ¶ 110).

On June 22, 2009, Seehase, Brandsma, Barnes and Neff met with Lanc to discuss Plaintiff (SMF ¶ 112). Seehase, Brandsma, and Barnes cited concerns about Plaintiff's lack of professionalism and maturity, as evidenced by the comments she had made about the clinic and hospital staff (*id.* ¶ 114). Seehase advised Lanc that Plaintiff was "undermining the team" (*id.* ¶ 116). Lanc asked the group if they believed Plaintiff could be placed on a work improvement plan (*id.* ¶ 122). None of them believed Plaintiff's performance could be salvaged (*id.* ¶ 123). Brandsma, Seehase, Barnes and Neff gave Plaintiff a "vote of No Confidence" (*id.* ¶ 125). Based on the management team's recommendation, it was determined that Plaintiff's employment would be terminated (*id.* ¶ 126). Winkelmann did not participate in this meeting, nor did she express any opinion about whether Plaintiff's employment should be terminated (*id.* ¶ 127).

In late June or early July 2009, Lanc met with MacLeod to discuss terminating Plaintiff's employment (SMF ¶ 128). Lanc informed MacLeod of his June 22, 2009 meeting with Seehase, Brandsma, Barnes and Neff (*id.* ¶ 129). Lanc advised MacLeod that he considered putting Plaintiff on a performance improvement plan, but Seehase, Brandsma and Barnes "did not feel that would be possible, that it would make things – more problems than we were already encountering" (*id.* ¶ 130). After hearing the rationale for the decision, MacLeod agreed that Plaintiff's employment should be terminated (*id.* ¶ 132).

On July 15, 2009, Lanc and Seehase met with Plaintiff to advise her of the termination (SMF ¶ 133). Lanc reviewed with Plaintiff the issues they had discussed before she commenced her leave,

7

issues including excessive patient wait times at the OB/GYN clinic; inadequate scheduling of the physicians at the OB/GYN clinic; Plaintiff's "us-versus-them" mentality, and her negative comments that the hospital was "interfering" with the running of the clinic; her negative comments regarding staff; and her unwillingness to provide Lanc with financial details regarding the clinics (*id.* ¶ 135). Lanc explained that during the last ten weeks, he "had time to review, assess and audit the clinic performance and talk through the issues and changes that we had to implement" (*id.* ¶ 136). Lanc stated that "much of the issues or concerns that were on the surface before [Plaintiff] left [for her leave] were indeed signs of much bigger concerns" (*id.* ¶ 137).

Lanc cited fourteen performance issues, including the "significant and practically overnight elimination of patient wait times;" the finding of "a number of crucial violations" during a JCAHO audit; the lack of organization, documentation and ownership for the clinic's problems; and several examples of Plaintiff's poor attitude (SMF ¶ 138). Lanc advised Plaintiff that in light of her deficiencies and failures, "there was a lack of confidence in [her] ability to be a successful office manager" and to develop "growing and professional" clinics (*id.* ¶ 139). Lanc advised Plaintiff that he had decided to terminate her employment (*id.* ¶ 140). Plaintiff concedes that there were no statements made to her indicating that her employment was terminated as a consequence of her taking FMLA leave (Pl. Dep. [Def. Ex. 1, Dkt 90] at 294-95). Winkelmann remained employed as the interim Office Manager for the OB/GYN clinic until April 2010 (SMF ¶¶ 143-44).

On October 29, 2009, Plaintiff filed this suit against Defendant. Plaintiff alleged that Defendant's actions violated the FMLA (Count I) as well as Michigan's ELCRA (Count II).[2] On

---

[2]Plaintiff also set forth a "Cancellation of Release" claim (Count III), which the parties subsequently stipulated to dismiss (Dkts 4, 6).

September 29, 2010, after the completion of discovery and an unsuccessful attempt to mediate the case, Defendant filed a request for a Pre-Motion Conference (Dkt 45), proposing to file a motion for summary judgment on Counts I and II. The parties filed their motion papers in August 2011 (Dkts 90-101).

## II.  ANALYSIS

### A.  Motion Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008); *Harbin-Bey v. Rutter,* 420 F.3d 571, 575 (6th Cir. 2005). After reviewing the whole record, the Court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be litigated at trial. *Slusher,* 540 F.3d at 453.

### B.  Discussion

### 1.  FMLA

The Sixth Circuit Court of Appeals has identified two distinct theories of recovery available under the FMLA: the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2). *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). The employee must establish the elements of interference or retaliation by a preponderance of the evidence. *Id.* at 447 (citing *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005)).

Plaintiff's allegations in this case fit within both theories of recovery. Plaintiff argues that Defendant interfered with her FMLA rights by failing to restore her to her position (Pl. Resp., Dkt 95 at ¶ 6). Plaintiff also claims that Defendant terminated her employment in retaliation for taking an FMLA leave (*id.* ¶ 7). However, on this record, interpreting the evidence in the light most favorable to Plaintiff, the Court determines that Plaintiff has not demonstrated a genuine issue for trial under either theory.

**a.** *Interference*

The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). Among these statutory rights is the right of an eligible employee to take up to 12 weeks of leave "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. §§ 2612(a)(1)(A). A concomitant right is that of an employee who has taken FMLA leave "to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C. § 2614(a)(1)(A).

To prevail under the interference theory, an employee must establish the following:

1. the employee is an eligible employee as defined by 29 U.S.C. § 2611(2);

  2.  the employer is an eligible employer as defined by 29 U.S.C. § 2611(4);

  3.  the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1);

  4.  the employee gave the employer notice of her intention to take FMLA leave, 29 U.S.C. § 2612(e)(1); and

  5.  the employer denied the employee FMLA benefits to which he was entitled.

*Wysong*, 503 F.3d at 447 (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). The parties' disagreement here is focused on the fifth element, whether Defendant denied Plaintiff an FMLA benefit to which she was entitled, to wit: restoration of her position.

As Defendant emphasizes (Def. Mot., Dkt 91 at 15-16), "[t]he right to reinstatement [under the FMLA] is ... not absolute." *Kohls v. Beverly Enter. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001). An employer need not reinstate an employee who would have lost her job even if she had not taken FMLA leave. *Id.* at 804-05. Whether an employer violates the FMLA therefore turns on "why the employee was not reinstated." *Id.* at 805. "If the employee cannot show that [s]he was discharged because [s]he took leave—or at least that h[er] taking of leave was a "negative factor" in the employer's decision to discharge [her]—she cannot show a violation of the FMLA. *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003) (citing *Kohls, supra*). *See also Wysong*, 503 F.3d at 447 (quoting 29 C.F.R. § 825.220(c) ("employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

In this regard, Defendant argues that Plaintiff was not entitled to reinstatement based on performance deficiencies discovered while she was on leave (Def. Mot., Dkt 91 at 17-18). Plaintiff responds that whether Defendant terminated her employment based on her performance is an issue of fact (Pl. Resp., Dkt 95 at 4). Plaintiff admitted at her deposition that Lanc received terribly negative reports about her performance and actions from Seehase, Winkelmann, and others, but

11

Plaintiff nonetheless opined that Lanc fired her "because I took my leave" (SMF ¶¶ 147-48). However, other than her subjective belief, none of the evidence Plaintiff references in response to Defendant's motion demonstrates that in making the adverse decision, Defendant used her taking of an FMLA leave as a negative factor in its decision to terminate her employment.

Plaintiff relies, for example, on the interim managers' alleged "motive to exaggerate" and on Lanc's alleged failure to follow discipline policies in failing to warn her of the consequences of her performance deficiencies (Pl. Resp., Dkt 95 at 4-5). However, Plaintiff, an at-will employee, admitted during her deposition that Defendant's policies do not "mandate" progressive discipline (SMF ¶ 149). Moreover, neither of Plaintiff's allegations, even taken as true, demonstrate that Plaintiff's taking of leave was a "negative factor" in Defendant's decision to discharge her.

Plaintiff also emphasizes the timing of her termination: that she was fired as soon as she returned to work from her leave, even though Lanc was aware of her alleged deficiencies before she took her leave (Pl. Resp., Dkt 95 at 5-6). However, timing alone is not dispositive because "the FMLA does not give an employee who invokes the protection of the statute any greater rights to employment than the employee would otherwise have had." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 316 (6th Cir. 2001) (citing 29 U.S.C. § 2614(a)(3) ("Nothing in this section shall be construed to entitle any restored employee to– (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.")). Indeed, Plaintiff admitted that Defendant could discipline an employee if it determined that the employee was doing a poor job, regardless of whether the employee took FMLA leave (SMF ¶ 152). The temporal proximity argument is particularly unconvincing where, as here, a plaintiff's prima facie claim is otherwise weak. *Coulter v. Deloitte*

*Consulting, L.L.C.*, 79 F. App'x 864, 867 n.5 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000)).

The last assertion Plaintiff makes in response to Defendant's motion is her claim that under the Bullard-Plawecki Employee Right to Know Act, MICH. COMP. LAWS § 423.502, Defendant cannot rely upon the memoranda and email messages from Winkelmann and Seehase because they were not kept in her personnel file (Pl. Resp., Dkt 95 at 8). In her response to Defendant's motion, Plaintiff excerpts only the portion of the statute providing that "[p]ersonnel record information which was not included in the personnel record but should have been as required by this act shall not be used by an employer in a judicial or quasi-judicial proceeding." MICH. COMP. LAWS § 423.502. The statute further provides that "personnel record information which, in the opinion of the judge in a judicial proceeding or in the opinion of the hearing officer in a quasi-judicial proceeding, was not intentionally excluded in the personnel record, may be used by the employer in the judicial or quasi-judicial proceeding, if the employee agrees or if the employee has been given a reasonable time to review the information." *Id. See also* MICH. COMP. LAWS § 423.501(2)(c) (defining "personnel record" as "a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action").

This Court is not convinced that the state statute would bar admission of the challenged documents in a trial in this Court. *See* FED. R. EVID. 1101(b); *Burke v. Health Plus of Mich., Inc.*, No. 01-10335-BC, 2003 WL 102800, at *8 (E.D. Mich. Jan.7, 2003) (explaining that the federal rules of evidence generally apply to civil actions and proceedings). However, even assuming the

preclusion sanction is applicable to this federal court action, and even assuming the memoranda and emails at issue are "personnel records" within the meaning of the statute, there has been no evidence presented that Defendant made a conscious decision to keep the evidence separate from Plaintiff's personnel file, and no prejudice to Plaintiff shown where she and her attorney were privy to the memoranda and emails early in this case. *See* Def. Reply, Dkt 101 at 3.

In sum, none of the evidence and arguments upon which Plaintiff relies creates a genuine issue of material fact about whether her taking of an FMLA leave was a "negative factor" in Defendant's decision to discharge her. Plaintiff's omission is fatal to the progression of her FMLA claim under an interference theory of recovery. As the Eleventh Circuit opined, the FMLA's purpose "is not implicated in the least if an employee's absence permits her employer to discover past professional transgressions that then lead to an adverse employment action against the employee." *Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236, 1242 (11th Cir. 2010) (deciding that the district court did not err in granting judgment in the employer's favor on the employee's FMLA interference claim).

**b.** *Retaliation*

FMLA retaliation claims founded upon circumstantial evidence are adjudged in accordance with the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Clark v. Walgreen Co.*, 424 F. App'x 467, 472-73 (6th Cir. 2011). To prevail under a retaliation theory, the employee must show that the employer discharged or otherwise discriminated against him for exercising FMLA rights or opposing any practice made unlawful by the FMLA. *Arban v. West Pub. Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). A plaintiff makes a prima facie case of retaliation by showing that

      1.      the employee availed herself of a protected right under the FMLA by notifying the employer of her intent to take leave,

      2.      the employee suffered an adverse employment action, and

      3.      there was a causal connection between the exercise of rights under the FMLA and the adverse employment action.

*See Edgar*, 443 F.3d at 508 (citing *Skrjanc*, 272 F.3d at 314 (setting forth this framework); and *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005) (applying this test to a retaliatory-discharge claim under the FMLA)). If the employee satisfies these three requirements, then the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Id.* (citing *Skrjanc*, 272 F.3d at 315).

Defendant asserts that it is entitled to summary judgment of Plaintiff's retaliatory-discharge claim because Plaintiff cannot satisfy the last prong of the inquiry, the requisite casual connection (Def. Mot., Dkt 91 at 18-19), and that even if Plaintiff could make a prima facie case, she cannot establish that the proffered reason for her termination is pretextual (*id.* at 19-24).

Plaintiff did not organize her response to Defendant's motion by addressing each theory of recovery individually. Plaintiff does not appear to offer any argument in response to Defendant's motion for summary judgment on the retaliation theory of her FMLA claim other than to reiterate her argument that "Lanc's decision was not reasonably informed" inasmuch as Lanc "should have considered the ulterior motives of Seehase and Winkelmann" and "declined to ask for and consider plaintiff's side of the story" (Dkt 95 at 14-15).[3]

---

[3] To the extent Plaintiff intends for her other arguments to also apply here, the analysis set forth in the interference section, *supra,* governs the retaliation analysis here and leads to the same conclusion that Plaintiff has not shown a genuine issue for trial.

Even assuming Plaintiff can establish a prima facie case, she has not established that the proffered reason for her termination–her performance deficiencies–is pretextual. Plaintiff's subjective assessment of the decision-making process does not demonstrate that Defendant's decision violated the FMLA. "In determining whether an employer 'reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Jones v. Nissan N. Am., Inc.*, No. 09-5786, 2011 WL 3701785, at *13 (6th Cir. Aug. 18, 2011) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)). Plaintiff's argument amounts to nothing more than her challenge to Defendant's business judgment, and does not reveal an alleged FMLA violation to be litigated at trial. *See, e.g., Marshall v. Summa Health Sys. Hosps.*, 66 F. App'x 598, 600 (6th Cir. 2003) ("[Plaintiff] suggests that her positive performance evaluations from past years should have outweighed the staff complaints, but she points to nothing suggesting that [her employer] violated [the law] by resolving this balance against her."); *Clark*, 424 F. App'x at 474 (finding summary judgment proper where "Clark's only evidence rebutting these allegations is Clark's own vehement denial").

In sum, Plaintiff has not shown a genuine issue for trial under either theory of recovery under the FMLA, and Defendant is therefore entitled to summary judgment of Count I.

**2. ELCRA**

In Count II of her Complaint, Plaintiff alleges that her termination "violated the public policy against discharge in contravention of a civil right conferred under [the] ELCRA" (Compl., Dkt 1 at ¶ 26). However, a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th

Cir. 2006). Here, the interests of justice and comity are best served by a state court's resolution of the state law claim. *See Widgren v. Maple Grove Twp.*, 429 F.3d 575, 585 (6th Cir. 2005).

### III. CONCLUSION

For the foregoing reasons, the Court determines that Defendant's Motion for Summary Judgment (Dkt 90) is properly granted. An Order will be entered consistent with this Opinion.


DATED: October  31 , 2011            /s/ Janet T. Neff
                                     JANET T. NEFF
                                     United States District Judge